RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
Cristen C. Thayer
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Cristen_Thayer@fd.org

Attorney for Dwayne Martin

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Dwayne Martin,<br><br>Defendant. | Case No. 2:18-cr-00029-JCM-VCF-1<br><br>**Stipulation to Correct Omission from Record** |

It is stipulated and agreed, by and between Peter Walkingshaw, Assistant United States Attorney, counsel for the United States of America, and Cristen C. Thayer, Assistant Federal Public Defender, counsel for Dwayne Martin, that the record should be corrected to include Defense Exhibit L from the evidentiary hearing on the motion to suppress. *See* Attachment A, Defense Exhibit L, statement of Kierra Washington

This stipulation is entered into for the following reasons:

1. Mr. Martin's direct appeal, which challenges the denial of his motion to suppress, is pending. The Opening Brief due August 27, 2021.

2. At the suppression hearing, among other exhibits, this Court admitted Defense Exhibit L, which is the transcribed statement of Kierra Washington. *See*

ECF No. 50 at p. 9. This exhibit was inadvertently left off of the final exhibit list. *See* ECF No. 53.

4. Under Federal Rule of Appellate Procedure 10(e)(2), the Court may correct a material omission from the record by stipulation of the parties. Undersigned counsel therefore jointly request the Court order that that Defense Exhibit L be made part of the record.

Dated: August 26, 2021.

RENE L. VALLADARES
Federal Public Defender

By */s/Cristen C. Thayer*
CRISTEN C. THAYER
Assistant Federal Public Defender

CHRISTOPHER CHIU
Acting United States Attorney

By */s/Peter Walkingshaw*
PETER WALKINGSHAW
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

United States of America,

Plaintiff,

v.

Dwayne Martin,

Defendant.

Case No. 2:18-cr-00029-JCM-VCF-1

**Order Granting Stipulation to Correct Ommission from Record**

Based on the stipulation of counsel, the Court finds that good cause exists to correct the omission from the record under Federal Rule of Appellate Procedure 10(e). IT IS HEREBY ORDERED that Defense Exhibit L from the evidentiary hearing on the motion to suppress, *see* Attachment A to the Stipulation to Correct Omission from Record, is hereby made part of the record in this matter.

DATED: August 27, 2021.

UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

# VOLUNTARY STATEMENT

PAGE 1

**EVENT #: 170908-1316**

---

**SPECIFIC CRIME:** ASSAULT WITH A DEADLY WEAPON

**DATE OCCURRED:** 09-08-2017 **TIME OCCURRED:** 0957

**LOCATION OF OCCURRENCE:** 5801 W LAKE MEAD

**CITY OF LAS VEGAS** **CLARK COUNTY**

---

**NAME OF PERSON GIVING STATEMENT:** KIERA WASHINGTON

| | | | |
|---|---|---|---|
| **DOB:** | [redacted] | **SOCIAL SECURITY #:** | |
| **RACE:** | | **SEX:** | |
| **HEIGHT:** | | **WEIGHT:** | |
| **HAIR:** | | **EYES:** | |
| **HOME ADDRESS:** | [redacted] | **PHONE 1:** | |
| **WORK ADDRESS:** | | **PHONE 2:** | |

---

The following is the transcription of a tape-recorded interview conducted by DETECTIVE ERIC STAFFORD, P# 13642, LVMPD GANG/VICE SECTION, on September 8, 2017 at XXXX hours. Also present is DETECTIVE JAMES KEEN, P# 14455, LVMPD GANG/VICE SECTION.

Q: Operator, this is Detective Eric Stafford, P# 13642, conducting a taped victim interview under LVMPD Event # 170908-1361. The, uh, interview is being conducted in a continuing investigation into an assault with a deadly weapon, that occurred on September 8, 2017, at approximately 0957 hours. At [redacted], [redacted]. I'm speaking with last name Washington, common spelling. First name Kiera, uh, K-I-E-R-A. Her date of birth is [redacted] [redacted]. She lives at [redacted] [redacted]

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
**PAGE 2**

**EVENT #: 170908-1316**
**STATEMENT OF:** KIERA WASHINGTON

[REDACTED]. She doesn't have a phone right now. Uh, also present is Detective James Keen, P# 14455. Okay. Now Kiera, I understand there's a - there's been a whole bunch of stuff that's happened, um, in the last 24 hours with you, right?

A: Yes.

Q: Uh, I'm concerned about just this morning. Okay. Do you understand what I mean, just this morning?

A: Yeah.

Q: I want to go into what happened, uh, yesterday also - also. Uh, but right now I'm just concerned with what happened today...

A: Okay.

Q: ...okay? So, uh, what happened today? Where did you - where did you sleep last night?

A: I slept at my mom's house.

Q: Where is your mom's house at?

A: She stay on Lake Mead and Martin Luther King.

Q: Lake Mead and Martin Luther King?

A: Yes.

Q: Okay. And so, you stayed there last night?

A: Yeah.

Q: What time did you wake up to come, uh, do - you went home at some point, back

to your house, correct?

A: Uh, yeah. I made it over here like 7:00, 8:00. Like late 7:00, 8:00.

Q: Okay. And so, you, uh - so you woke up at 7:00 or 8 o'clock?

A: Mm-hm.

Q: And then you went to your apartment, correct?

A: I went to the, uh, office to get a spare key.

Q: You went to the office to get a spare key first?

A: Yes.

Q: Okay, and then what?

A: And then I went to the apartment. And I opened the door and he was inside the apartment.

Q: Who is he?

A: Dwayne.

Q: Oh.

A: Was inside the apartment and he was- Oh, half of my stuff was already gone, but he was taking the rest of it out. And the gun was on...

Q: What was he doing with it?

A: He was putting it in his car.

Q: In his car? Okay. In the trunk or in the, uh?

A: The trunk.

Q: The trunk, okay. Uh, what kind of stuff was he taking of yours?

A: Uh, he - it was my daughter's toy chest. It was her bag of clothes, her shoes. My bag of clothes. I had a suitcase with clothes and shoes in it.

Q: Okay.

A: And uh, the other stuff that he took was already gone.

Q: Okay.

A: That I seen - that I seen him took, that's what was the clothes.

Q: Okay. And what - what happened then?

A: And when I went inside the apartment he was taking the stuff. We started arguing. He said I, uh, that I was a police ass bitch, 'cause I was trying to call the police. But he took the phone. When we - he ran outside to his car and I was looking through the blinds and he was standing, uh, in the back on the phone. And then I called the police. I was on the phone with the police officer, but the lady, she told me to remain on the line. And - well, I was sitting on the line with her and then he ran back into the apartment, that's when he started fighting me. And then he pointed the gun out and said, "You're a police ass bitch, you're a big mistake."

Q: So you were already talking to the dispatcher when...?

A: Yeah, but I - the phone hung up when he came back in, because he - we started fighting.

Q: Okay. The phone hung up or you hung it up?

A: Yeah. No, the phone fell.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 5

**EVENT #: 170908-1316**
**STATEMENT OF:** KIERA WASHINGTON

Q: Okay.

A: And, uh.

Q: But you didn't hang up though?

A: No, I didn't hang up.

Q: Okay.

A: And, uh, after that that's when he pointed the gun and said, "You're a police ass bitch." "You're a big mistake." And he was like, "I know where your mom stay at." He ran out and then, like, got into his car. He left out and I...

Q: What car was he driving?

A: The gray Impala.

Q: Okay.

A: Uh, but after that I sat in the apartment, that's when I heard the officers coming to the door.

Q: Okay. What kind of gun did he have?

A: It was, like, black and it has - the top is gray with a - like a long plate.

Q: Maybe a little 30 popper in it?

A: It was a handgun. I don't - I'm not sure.

Q: Okay. Okay. All right. Did, uh, how did he get into your - do - do you guys live in that apartment together?

A: Yes. He has a key and then from this thing yesterday, he took my car keys, which has my apartment keys.

Q: Okay. Okay. Did, uh...

A: He had both sets of keys.

Q: Was anybody else with him or no?

A: No. I didn't see nobody else, no.

Q: You didn't see anybody else with him at all?

A: No.

Q: Okay. Hm. Keen.

Q1: Um, you said you walked in, you said you saw the gun initially. Where was it at?

A: The gun was on the counter - kitchen counter.

Q1: Kitchen counter, it was sitting there?

A: Yeah.

Q1: Have you ever seen him with a firearm before?

A: Yes. He always carries it.

Q: Okay. Where does he keep it?

A: Uh, usually in his car.

Q: Usually in his car, okay. Where does he keep it in the car usually?

A: Uh, it's like a little console.

Q: Uh huh.

A: He just pulls up and he puts it in there.

Q: Okay. So, there's like the center console and then there's a tray in the center console. So it's almost like a little...

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 7

**EVENT #: 170908-1316**
**STATEMENT OF:** KIERA WASHINGTON

A: Like where the - the, uh.

Q: The E brake?

A: The - yeah.

Q: The shifter of the E brake?

A: The - pull it up and then it's like a stash.

Q: Okay. So, he's got a little stash that he keeps the gun in there?

A: Yeah.

Q: Okay. Does he ever keep it in his mom's house or no?

A: I'm not sure.

Q: You're not sure. Okay. Does he have any other girlfriends or anything like that that you know about or no?

A: Uh, that's why - that was the argument started originally, yeah.

Q: Okay. That's why the argument started 'cause there's some other girl involved?

A: Yeah. She - she (unintelligible) me on Facebook.

Q: About what?

A: Uh, I was - basically saying that she was - that was her dude.

Q: Okay.

A: Yes.

Q: Okay. Now, uh, I'm running into some - some - some road blockage here. So, I just want to be really clear with you, okay? It's very important that you're truthful with me.

A: Mm-hm.

Q: If - if you have lied about anything, it's not that important. His whole family upstairs says that he's never left the house this morning.

A: Mm-hm. The - they - no.

Q: Does - now - is that definitely a lie?

A: The - it is.

Q: Okay. And would you say that his family's...

A: He - uh.

Q: ...covering for him or...?

A: Yeah, they are covering for him.

Q: Okay. Why would they cover for him?

A: His aunt's always cover for him. I've bailed him out twice and she's been there. And, she's the one calling me trying to help get him out. His aunts are always covering for him.

Q: Okay. So is there...

A: All my stuff is gone out my apartment.

Q: Okay. Okay. Um, and what did you say was in the, uh - what else - what else did he take from your - from your house?

A: It's, oh just mainly all the clothes. And then I had, like, six bottles of alcohol and...

Q: Did he put anything in the front of the car?

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 9

**EVENT #: 170908-1316**
**STATEMENT OF:** KIERA WASHINGTON

A: Uh, no. Only the...

Q: It was all in the trunk?

A: Yeah.

Q: Okay.

A: It's like a pink - pink toy box. Uh, black baggie - trash bags with clothes.

Q: Okay.

A: And it's a zebra print uh, suitcase.

Q: Okay. Where did he hit you today?

A: Just - he just hit me upside the head.

Q: Hit you upside the head, okay. And is that a scratch on your cheek from another time?

A: This from yesterday.

Q: From yesterday, okay. And where did that happen at?

A: That happened on Shine and Ellis.

Q: Shine and Ellis, mm-hm.

A: At the warehouse.

Q: The warehouse?

A: Yeah.

Q: What was y'all doing at the warehouse?

A: I was taking him his lunch. And on my way to take him his lunch is when the girl was (unintelligible) me.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

# VOLUNTARY STATEMENT

**EVENT #: 170908-1316**
**STATEMENT OF:** KIERA WASHINGTON

Q: Oh, okay. So you showed up at work. Uh, you showed up his work and already a little mad about this whole thing, uh?

A: Yeah. I was taking him his lunch and...

Q: Okay.

A: ...on my way there she was (unintelligible) me. But when I got there we started arguing about it.

Q: Okay. All right. Uh, did he make any phone calls while he was there or no?

A: Uh, I seen him on the phone while...

Q: You seen him on the phone.

A: ...he was outside.

Q: Okay.

A: And he was calling this phone - his - this is his phone. He was calling from like a free text app.

Q: That's his phone?

A: Yeah.

Q: Okay. Uh, from when?

A: Uh, like early this morning - like 4 or 5 o'clock in the morning. He was calling his phone from the text free app.

Q: Okay. And so, he gave you that phone or...?

A: No, I took it yesterday. When he broke mines I...

Q: Oh, okay.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

**VOLUNTARY STATEMENT**

EVENT #: 170908-1316
STATEMENT OF: KIERA WASHINGTON

A: ...snatched his phone.

Q: So what phone was he using today, do you know?

A: Oh, I don't know.

Q: You don't know.

A: No, I don't.

Q: Okay.

A: But he musta done with it like a text free app, because when I tried to call it back...

Q: Okay.

A: ...it was like this is a text free number.

Q: Okay. Can you show me, uh, some of the texts he sent you (unintelligible) this text free thing?

A: No. It's like - I can only answer.

Q: Oh, it's locked out?

A: Yeah, I can only answer calls. I been trying to unlock it.

Q: Okay, gotcha. Uh. Keen, you got any questions now?

Q1: Yeah. When, uh, when he hit you this morning, was it like a punch? Did he hit you with the gun? Do you know what he used or...?

A: No, it was just a punch to the head.

Q: Okay. So, you got any like swelling or anything like that?

A: Uh, it's just a little sore.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**

**EVENT #:** 170908-1316
**STATEMENT OF:** KIERA WASHINGTON

Q: Just a little sore, okay.

Q1: How did the, uh, 911 call go when you called in and they said, uh...?

A: Uh, I was just basically telling her that he was chasing the officer, because he basically was in my house taking my stuff. And that was the first call before the phone hung up. 'Cause I called twice and that's when that - the second call when I told her that he had the gun out. And, uh, she told me stay on the line. I stayed on the line and he came back in and he - that's when he hit me upside the head and he was like, "Police ass bitch." "I know where your mom stays." "You was a big mistake." And then he left out. And she - the dispatcher called back, like, a couple minutes later, but the police was already there. So, once I told her that she hung up.

Q: Okay. Okay.

Q1: Uh, so you guys got in an incident, uh, last night?

A: Yesterday, like 7:00, yeah.

Q1: Was there like a battery that occurred? Did anyone get hit?

A: Yeah. Yesterday he really beat me yesterday.

Q1: Like really bad?

A: Yeah. Like he beat me while I was standing up and he beat me to the ground. And he choked me. I was almost fixin' - I was fixin' to pass out. But he was choking me for a long time. But the helicopter came. So, he like just let me go and he drove off. And the helicopter followed him and the police followed him.

But they came back and said he had to let him go, 'cause he was running red lights and we can't run red lights, so.

Q1: Uh. So, when you came to the apartment this morning to get the key, did you know that his vehicle was parked out? So, you pretty much knew he was at the apartment?

A: No, I didn - no, I didn't see it when I - 'cause I parked on the other side. I was in my sister's car - my brother's sis - my brother's girlfriend's car.

Q1: Okay. So, I guess here's my (unintelligible) view. You go into the apartment, he's inside.

A: Yeah, I - I.

Q1: And you - you just got beat pretty bad the night before.

A: Yeah.

Q1: Why didn't you leave?

A: Leave the apartment?

Q1: Yeah.

A: Leave when I first walked in?

Q1: Like this mornin' - yeah. Like got out - if it was me, I guess and I saw somebody that beat my ass the night before I would get out of there and call the police.

A: Yeah, but I did call...

Q1: Is it just kinda - I just don't understand why you...

A: ...the police.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
VOLUNTARY STATEMENT
PAGE 14

EVENT #: 170908-1316
STATEMENT OF: KIERA WASHINGTON

Q1: ...why you stayed in that environment, you know what I mean?

A: Well, when I went in, it was like a argument, but I did call 911. It's not - I was in - I wasn't in there that long.

Q1: Hm, okay.

Q: Okay. What...

A: Yeah, it wasn't that long.

Q1: Okay.

Q: Okay.

A: I didn't know he was gonna go to the apartment and take my stuff. I wouldn't have never...

Q: Yeah.

A: ...went there for sure.

Q: Yeah. Okay. Uh, operator, the date is, uh, September 8, 2017, the time is 1336 hours. This will end the inter - interview for now.

---

**THIS VOLUNTARY STATEMENT WAS COMPLETED AT XXXX ON THE 8TH DAY OF SEPTEMBER, 2017 AT 1336 HOURS.**

NET:sd

Voluntary Statement (Rev. 06/10)